Roger A. STILES
and Betty Stiles,
husband and wife,
*Plaintiffs-Appellants,*

*v.*

David GODSEY,
as Trustee of the Margaret H. Ponting Trust;
James A. Stoner; Douglas F. Richardson;
Jocelyn H. Richardson; John Allen Dillingham;
Linden Dale Kincaid; Marle Kincaid;
Stephen M. Foster; Charlene L. Walker;
Carl D. Sawyer; Carol J. Sawyer;
Marjorie T. Condray, as Trustee of
the Marjorie T. Condray Living Trust;
and Laverne Methven, as Trustee of
the Laverne Methven Revocable Trust,
*Defendants-Respondents,*
*and*

Emery L. GAJDAN,
et al.,
*Defendants.*

Josephine County Circuit Court
02CV0357; A150614

310 P3d 682

Natalie C. Scott argued the cause for appellants. With her on the briefs was The Scott Law Group.

Duane Wm. Schultz argued the cause for respondents James A. Stoner, John Allen Dillingham, Linden Dale Kincaid, Marle Kincaid, Stephen M. Foster, Charlene L. Walker, Carl D. Sawyer, Carol J. Sawyer, Marjorie T. Condray, and Laverne Methven. With him on the brief was Duane Wm. Schultz, P.C.

No appearance for respondent David Godsey.

No appearance for respondents Douglas F. Richardson and Jocelyn H. Richardson.

Before Armstrong, Presiding Judge, and Nakamoto, Judge, and Egan, Judge.

EGAN, J.

**EGAN, J.**

In *Stiles v. Godsey*, 233 Or App 119, 225 P3d 81 (2009) (*Stiles I*), we concluded that plaintiffs had acquired title to a portion of their neighbor's property—over which an easement ran—through adverse possession. Following our remand to the trial court, a dispute arose between the parties regarding whether our opinion in *Stiles I* awarded plaintiffs the entire easement area or less than the entire easement area. The trial court concluded that our opinion in *Stiles I* intended to exclude two separate portions of the easement and, accordingly, entered an amended general judgment that quieted title to the majority of the easement in plaintiffs' favor, but excluded those two separate portions. Plaintiffs timely appeal from that amended judgment and contend that our opinion in *Stiles I* required the trial court to enter a judgment quieting title to the entire easement in their favor. They also argue that the trial court erred by including a provision in the amended judgment that "preserved" defendant Stoner's rights to reconstruct his carport. For the following reasons, we reverse and remand with respect to the southern portion of the deeded easement.

Plaintiffs' lot lies to the west of, and adjacent to, defendant Stoner's lot. Stoner's lot was created as part of a subdivision known as Mesman Manor. In *Stiles I*, plaintiffs brought an action for adverse possession over a portion of defendant Stoner's land. On *de novo* review, we first noted that "[t]he disputed area has three sections, each distinct in character and use." 233 Or App at 123. Two of those sections—referred to as the "accreted easement" and the "riverfront triangle"—are not at issue in the present appeal. The other section was referred to as the "deeded easement" and was originally created to allow the owners of the other Mesman Manor subdivision lots to access the Rogue River. In the factual background portion of *Stiles I*, we described the deeded easement section as follows:

> "The first section of the area in question is the original Mesman Manor easement strip, which runs between the residences on the Stiles and Stoner lots, along the westerly border of the Stoner lot. The parties refer to this piece of property as the 'deeded easement' because it is referenced

and described in the Mesman Manor deeds. The area is
fenced by a stake fence that runs along its eastern side,
within the Stoner lot, a wire fence placed by plaintiffs
against the stake fence to contain their pets, and a board
fence across the easement that joins with plaintiffs' drive-
way gate, effectively blocking the mouth of the easement
from a southern entry. Those fences separate the first sec-
tion of the disputed area from the rest of the Stoner lot
and the other subdivision lots. Plaintiffs' patio and drive-
way encroach into this first section of the disputed area.
Plaintiffs have made other improvements to that area."

223 Or App at 123.

After describing the other two sections of property
at issue in *Stiles I*, we included a diagram in our opinion,
reproduced below, which we prefaced by stating that "[t]he
properties are configured as follows":

*Id.*[1] That diagram—which was created by this court—was
based on a surveyor's map that was submitted by plaintiffs as

---

[1] The version of *Stiles I* that was published in the Oregon Court of Appeals
Reports does not contain the diagram that was included with the slip opinion; the

an exhibit at the trial underlying *Stiles I*. The diagram in the opinion was a vastly simplified version of the surveyor's map, which was extensively referred to by the parties throughout the underlying proceedings and in the appeal in *Stiles I*.

After setting out both the description and the diagram, we proceeded to address plaintiffs' statutory adverse possession claim by first laying out the applicable legal standard under ORS 105.620: "[P]laintiffs must show by 'clear and convincing evidence' that they have 'maintained actual, open, notorious, exclusive, hostile and continuous possession' of the disputed area for a period of 10 years." *Id.* at 126. We also noted that ORS 105.620 requires that the would-be adverse possessors maintain an honest and reasonable belief that they were the owners of the property for the statutory period. *Id.* at 127-28. After an amplification of those legal criteria, we concluded that plaintiffs had met their burden of demonstrating adverse possession with respect to a portion of Stoner's property:

> "Applying the statutory criteria to the disputed area, we conclude that plaintiffs presented clear and convincing evidence of adverse possession of the first section—the deeded easement portion—of the disputed area against all defendants, but that such proof was lacking as to the accreted easement and riverfront triangle portions of that area. With respect to the deeded easement portion, the record shows that the covered patio to plaintiffs' house encroaches into the easement area. It is not clear if the patio was originally constructed as part of the house in 1956, but the record shows that the patio was covered and improved sometime after the easement was created in 1966."

*Id.* at 128.

We then analyzed the statutory criteria as applied to the physical features of the disputed property:

> "As noted above, a wooden stake fence exists on the eastern border of the deeded easement and 10 feet into the Stoner lot. It is not clear when that fence was built. The description of the Mesman Manor subdivision in the 1959 plat refers to a fence along the border of the subdivision in

---

diagram should appear at the bottom of page 123. There is no apparent explanation for its omission. The diagram does appear in 225 P3d at 84.

this area. The fence was obscured by a blackberry thicket that existed in the southern part of the deeded easement area until that area was cleared by plaintiff Roger Stiles sometime in 1988 or 1989. Defendant Stoner's predecessor in interest was aware of plaintiffs' activities in the deeded easement area and, at times, requested plaintiffs to make repairs to the wooden stake fence.

"Plaintiffs' driveway cuts across the deeded easement at the southern end of the easement. The driveway has been in place since plaintiffs' house was constructed. The driveway is gated. A 1979 Josephine County Tax Assessor's diagram of the property includes both the patio and driveway, and there is no evidence in the record that plaintiffs' possession of either patio or driveway has been interrupted since then. A cross fence connects the driveway gate with the wooden stake fence and blocks access to the deeded easement area. The driveway gate displays a sign that reads, 'POSTED, KEEP OUT, NO TRESPASSING.' The cross fence has been in place since at least 1979. It is unclear when the sign was placed on the gate. In 1988 and 1989, after his purchase of Tax Lot 2300, plaintiff Roger Stiles removed the blackberries from the deeded easement area, reinforced the fence with hog wire to contain the family pets, constructed and placed planter boxes in the easement area, planted the area with additional bushes, and installed a sprinkler system. The patio was enclosed in 1990.

"The maintenance and improvement to the wooden stake fence on the Stoner property is significant evidence that plaintiff Roger Stiles was asserting a claim to the fenced property and providing open and visible notice of that claim to the owners of the Stoner parcel. The fence also operates to describe and delineate the claimed area. *See* [*Norgard et al. v. Busher et ux.*, 220 Or 297 at 306, 349 P2d 490 (1960)] (describing the legal effect of fencing for an adverse possession claim). The long-term physical encroachment of the patio onto the disputed area is significant. *Green v. Ayres*, 272 Or 117, 121, 535 P2d 762 (1975) (long, continuous, and open possession by building encroachment 'makes out a *prima facie* case of adverse possession').

"All of the physical improvements to the deeded easement area are obvious, observable, and permanent. They are of the type that an owner would make and were sufficient to put the true owner of the property on notice of a

claim of right to the property. Plaintiffs' uses of the deeded easement area since 1989 and their restrictions of access to that area were sufficient to prove an 'actual, open, notorious, exclusive, * * * and continuous possession' of the deeded easement area under ORS 105.620(1)(a)."

*Id.* at 128-30 (ellipses in original).

We then turned to the question of whether plaintiffs' use of the deeded easement area was hostile.[2] Defendants asserted that plaintiffs' use was not hostile because plaintiffs could produce neither a written conveyance to support their claim, nor proof that plaintiffs' predecessors in interest intended to convey the deeded easement to plaintiffs. *Id.* at 129-30. We concluded otherwise, holding that plaintiffs had satisfied the hostility element of his claim by proving a "claim of right":

"Plaintiffs proved a claim of right to the deeded easement area by proof of an honest belief by plaintiff Roger Stiles that he owned the land. That honest belief was inspired by an oral representation by Jack Ridley at the time of sale, a representation that the property area ran from 'fence to fence.' Possession under a mistaken belief of ownership satisfies the requirement of hostile use to establish adverse possession. Plaintiff Roger Stiles testified that this belief continued after 1987 until the time the dispute arose between the parties in 2002, a period of approximately 15 years. That belief had an objective basis under ORS 105.620(1)(b)(B) because it was consistent with the fencing of the easement and the encroachments of the patio and driveway.

"Plaintiffs' honest belief regarding their ownership of the deeded easement area was also 'reasonable under the particular circumstances' as required pursuant to ORS 105.620(1)(b)(C). Under the factors of reasonableness articulated in *Manderscheid [v. Dutton*, 193 Or App 9, 88 P3d 281, *rev den*, 337 Or 247 (2004)] and *Clark [v. Ranchero Acres Water Co.*, 198 Or App 73, 108 P3d 31 (2005)]*, the size of the property boundary discrepancy, 10 feet, was small in relation to the size of [plaintiffs' lot]. Plaintiff Roger Stiles

---

[2] "A person maintains 'hostile possession' of property if the possession is under claim of right or with color of title. 'Color of title' means the adverse possessor claims under a written conveyance of the property or by operation of law from one claiming under a written conveyance." ORS 105.620(2)(a).

had no reason to question the accuracy of the property description given to him by Jack Ridley. The area was exclusively occupied and used for residential purposes by plaintiffs and their predecessors. Plaintiffs' occupation of the deeded easement area was inconsistent with its use by defendant and his predecessors as well as by the defendant easement holders and their predecessors. No objections were made by defendant or his predecessors to those residential uses or to the improvements made by plaintiffs. We conclude that plaintiff Roger Stiles's honest belief of ownership of the deeded easement area was reasonable under the circumstances, and that plaintiffs established adverse possession of the deeded easement area that extinguished the interests of defendants to that area."

*Id.* at 130.

After concluding that plaintiffs had not met the statutory requirements for adverse possession with respect to the other two sections of the disputed property, we ended our opinion by stating: "Reversed and remanded for entry of judgment quieting title to 'deeded easement' and confirming prescriptive easement as to 'accreted easement' and 'riverfront triangle' as described in this opinion; otherwise affirmed." *Id.* at 132.

Following our remand to the trial court, the present dispute about the scope of our holding in *Stiles I* arose, *i.e.*, whether we awarded plaintiffs the entire deeded easement or something less than the entire deeded easement. The parties' arguments before the trial court mirror the ones they make in this appeal. Specifically, defendants contended that the northern extent of that portion of the deeded easement awarded to plaintiffs in *Stiles I* was delineated by the endpoint of the stake fence running along the easement's eastern border; that is, defendants contended that the portion of the deeded easement that was acquired by plaintiffs runs as far north as the stake fence does. Plaintiffs contended that *Stiles I* awarded them the entire deeded easement; under plaintiffs' interpretation, the extent of the land that they acquired title to is delineated on the north by the southern boundary of the accreted easement, a point somewhat to the north of the end of the stake fence.

With respect to the southern end of the deeded easement, defendants contended that our opinion in *Stiles I* did not include either that portion of the deeded easement over which plaintiffs' driveway ran or a small triangle of land south of the driveway. Plaintiffs contended that *Stiles I* required the trial court to quiet title to the entire deeded easement in their favor and that the trial court erred in excluding the driveway and the southern triangle.

The trial court concluded that defendants were correct in both respects and, accordingly, excluded the above-described portions of the deeded easement from the property awarded to plaintiffs by the amended judgment. In concluding that the portion of the deeded easement awarded plaintiffs only extended as far north as the end of the stake fence, the trial court stated:

> "But part of the problem with this case, is trial was heard here, I personally have been out to that property, I think four times, maybe three times, but I think four times. I've walked—I've walked all of the area, I know that property. I think that I have a pretty good knowledge of—of the history of this case. I think I mentioned last time, I—I believe this is our oldest civil case in this Court, so we've got many, many files, many, many papers. I've read and re-read the Court of Appeals opinions, I've looked at all the exhibits. *** [W]hen the Court of Appeals is looking at a case, the judges don't have the—the opportunity to go out and walk the property, and—and actually see it and look at it. They're limited to looking at what the record is, and that means the paper, the transcripts, the argument of counsel, of course. But I have looked at that property. I, right now, can envision the fence. I can envision the slope of the property that you have to walk down. I, myself, had a little difficulty walking down that property at the natural ledge at the end of the fence. And—and you're absolutely correct *** that is—that—the natural setting of the land does not lend itself to continue the fence down to the river. That's nature, that's the way it was set up, and—and apparently the previous owners respected that and didn't try to fool with mother nature, and put a fence further down.

> "The bottom line is, this case must be resolved. I want all of the folks out there to have final resolution so they can get on with their lives ***. So, I am in agreement, again, after carefully reviewing the Court of Appeals Opinion, in other words, the narrative opinion, and trying to fully

understand what the intention was of the Court of Appeals, together with, obviously, the maps that are a part of that opinion as well. And I am convinced that it is * * * the end of the fence is the boundary between the—the deeded and the accreted easements. That is the natural setting, that is absolutely consistent with the facts presented in the trial in this case, in terms of the prior usage of the various parties over many, many years, and to—to extend it to incorporate other areas would not be consistent with the facts in this case, and I don't think, from my reading of the Court of Appeals Opinion, that it would be consistent with the intention of the Court of Appeals. Again, I'm just a Judge in the Trial Court, trying to read and interpret the opinion that it—that the—you two attorneys have also read and tried to interpret as well. But again, I'm just looking at this from a little bit different viewpoint, in that I've personally been on the property four times. I've lived with this case now, again, it was filed in 2002. And so—so we have some history, just in—in knowledge with that. * * * [T]he end of the fence will be the—the delineation."

With respect to the southern boundaries of the deeded easement, the trial court stated:

"As to the driveway, clearly in reviewing the Court of Appeal's decision and I have read this many times as you might imagine, there is a discrepancy in the way they describe the easement area as compared to the diagram; and the diagram does show the cross-hatches going through the driveway, and also into what we refer to [as] the small triangle, which is south of the Plaintiff's driveway; but the language of the Opinion where the Court actually spells out what the easement is * * * it talks about the mouth of the easement being on the north side of the plaintiff's driveway so the Court of Appeals did not, in this language, did not address that—the driveway in the south triangle so and—and clearly, based on all of the evidence that was presented at trial and my—I think I did three—three or four views. I have lost track now but my multiple views of the property and actually observing the use of the property this Court finds that that is not a part of the easement and there was not the use that the Court of Appeals relied upon. The factual basis for their decision did not apply to that area and the language that the Court of Appeals has on page two of their opinion indicates to me that that was not the intent notwithstanding the copy of the diagram, so that will not be a part of the easement."

Two points must be noted before we turn to our analysis. First, the parties do not dispute the precise bounds of the deeded easement itself; rather, they merely dispute the correct interpretation of *Stiles I* with respect to what portion of the deeded easement was adversely possessed by plaintiffs. Second, no party argues that our opinion in *Stiles I* left the trial court any discretion to determine the boundaries of the property adversely possessed by plaintiffs. The parties both urge that *Stiles I* answered the question at issue, they merely differ over in whose favor *Stiles I* answered it. *See Simmons v. Wash. F.N. Ins. Co.*, 140 Or 164, 166, 13 P2d 366 (1932) ("[W]hen a ruling or decision has been once made in a particular case by an appellate court, while it may be overruled in other cases, it is binding and conclusive both upon the inferior court in any further steps or proceedings in the same litigation and upon the appellate court itself in any subsequent appeal or other proceeding for review."); *State v. Custer*, 146 Or App 487, 489, 934 P2d 455 (1997) (reviewing whether the trial court's actions on remand were "contrary to our holding and directions" in the first appeal). We therefore review to determine whether the trial court erred as a matter of law by entering a judgment that conflicts with, or was contrary to, our "ruling or decision" in *Stiles I*.

With respect to the northern portion of the deeded easement, we conclude that *Stiles I* determined that the stake fence operated to define the northern boundary of that portion of the deeded easement that plaintiff was entitled to and, therefore, that the trial court did not err in excluding—from the property awarded to plaintiff—that portion of the deeded easement that extends north of the stake fence. As the foregoing discussion reveals, the stake fence played a critical role in *Stiles I*. We stated that the fence "operates to describe and delineate the claimed area." *Id.* at 129. We also stated that plaintiff Roger Stiles's honest belief of his ownership to the deeded easement was reasonable because he had been told by a predecessor in interest that the property ran from "fence to fence." *Id.* at 130. Moreover, we stated that "[t]he maintenance and improvement to the wooden stake fence on the Stoner property is significant evidence that plaintiff Roger Stiles was asserting a claim *to the fenced property* and providing open and visible notice of that claim to the owners of the Stoner parcel." *Id.* at 129 (emphasis added).

The importance of the fence in *Stiles I* is further emphasized by the fact that plaintiffs satisfied the hostility element of their adverse possession claim under a "claim of right," as opposed to "color of title." To establish a claim of right, plaintiffs had to show that they held "'honest but mistaken belief of ownership.'" *Id.* at 127 (quoting *Hoffman v. Freeman Land and Timber, LLC.*, 329 Or 554, 561 n 4, 994 P2d 106 (1999)). *Stiles I* involved a case of pure mistake; as we stated, "[t]he doctrine of pure mistake applies when a deed correctly identifies the boundaries of the land, but the person taking property under that deed actually occupies different property that he or she mistakenly believes is included in the deeded boundaries." 233 Or App at 127. Under a claim-of-right theory, a plaintiff can acquire title only to that land actually used or occupied by him or her. *Almond v. Anderegg*, 276 Or 1041, 1045, 557 P2d 220 (1976) ("Plaintiff can gain title only to that land *actually used or occupied* by her for the necessary 10-year statutory period." (Emphasis added.)). Because plaintiffs established adverse possession under a claim-of-right theory—that is, they did not rely on a written conveyance to establish their reasonable belief in their ownership under color of title—the actual bounds of the deeded easement, as described in the Mesman Manor deeds, were simply not relevant to plaintiffs' adverse possession claim.

*Stiles I* reflected the appropriate analytical focus by extensively relying on the uses of the deeded easement made by plaintiffs. Those uses included removing blackberry bushes, installing a sprinkler system, and constructing planter boxes. *Id.* at 129. There is nothing in *Stiles I*, however, to suggest that plaintiff made any use of that portion of the deeded easement strip that extended north of the stake fence line, and, indeed, the parties noted in their briefing that the topography of the land changed significantly at the end of the stake fence. Moreover, defendants in *Stiles I* specifically argued that, with respect to the accreted easement and the riverfront triangle—*i.e.*, the areas north of the stake fence's end—plaintiff Roger Stiles' reliance on the "fence to fence" statement was "not reasonable when the fence ends a considerable distance from the river."[3] In other words, the evidence

---

[3] Later in the opinion, we noted that plaintiff Roger Stiles was told by his predecessor in interest that the property line ran down to the river, *i.e.*, that it

presented and on which we relied in our *de novo* review in *Stiles I* would logically lead to the conclusion that any belief on plaintiffs' part that they owned that portion of the deeded easement north of the fence's end did not have an objective basis.

We acknowledge that there is language in *Stiles I* that, taken in isolation, might indicate an intent to award plaintiffs title to the entire deeded easement area. *See id.* at 130 ("[P]laintiffs established adverse possession of the deeded easement area that extinguished the interests of defendants to that area."). However, we think that language must be read in light of the opinion's tagline, which, again, stated: "Reversed and remanded for entry of judgment quieting title to 'deeded easement' and confirming prescriptive easement as to 'accreted easement' and 'riverfront triangle' *as described in this opinion*; otherwise affirmed." *Id.* at 132 (emphasis added). As noted, *Stiles I* stated that the stake fence "describe[s] and delineate[s] the claimed area." *Id.* at 129.

We acknowledge that the diagram in *Stiles I*, when examined in conjunction with the above-quoted language, lends some support to plaintiffs' position. Nevertheless, our written description controls. That is so because viewing the diagram in the context of the opinion as a whole leads to the conclusion that the diagram in *Stiles I*—which lacked the detail of the surveyor's map, was not drawn to scale, and failed to illustrate all of the property in dispute— was intended to serve as a visual aid for the reader, rather than a definitive depiction of the parties' rights and obligations. The trial court's amended judgment regarding the northern boundary of the deeded easement conformed to our

extended out along a northward projection of the fence line. We noted, however, that there was "simply no objective basis in the record to establish the boundaries of the accreted easement or the riverfront triangle." 233 Or App at 132. In other words, even though the accreted easement was of the same width as the deeded easement, and even though the accreted easement lay within the northern projection of the fence line, Roger Stiles had an objective basis to believe only that he owned the fenced area. Indeed, one of the reasons that we concluded that plaintiffs had not established the statutory elements of adverse possession with respect to the riverfront triangle or the accreted easement was that "there were no fence lines to mark the boundaries" of those areas. *Id.* So too, with respect to the northern portion of the deeded easement.

description of the disputed area in *Stiles I*, to the rationale underlying our decision, and to our remand instructions.[4]

The trial court's amended judgment did not, however, conform to our decision in *Stiles I* with respect to the southern portion of the deeded easement. As noted, the trial court concluded that the language of *Stiles I* supported its decision to exclude—from the land awarded to plaintiffs— that portion of the deeded easement over which plaintiffs' driveway ran and a small, triangular portion of the deeded easement south of the driveway. *See* 258 Or App at 153-54 (quoting trial court's reasoning).

The language on which the trial court relied was contained in the factual background section of *Stiles I*:

> "The [deeded easement] is fenced by a stake fence that runs along its eastern side, within the Stoner lot, a wire fence placed by plaintiffs against the stake fence to contain their pets, and a board fence across the easement that joins with plaintiffs' driveway gate, effectively blocking the mouth of the easement from a southern entry. Those fences separate the first section of the disputed area from the rest of the Stoner lot and the other subdivision lots. Plaintiffs' patio and driveway encroach into this first section of the disputed area. Plaintiffs have made other improvements to that area."

233 Or App at 123. Although it is conceivable to read that description as suggesting the intent to exclude the driveway and triangular area south of the driveway, such a reading becomes untenable when that description is read in the context of the opinion as a whole. Our reasoning and analysis in the later portions of *Stiles I* reveal that the factual description of the deeded easement area upon which the trial court relied was merely that—*viz.*, a general attempt, albeit a somewhat imprecise one—to generally describe the "disputed area."

---

[4] We also note that, if we had held in *Stiles I* that the property acquired by plaintiffs was merely the deeded easement as described in the Mesman Manor deeds, it would have produced a curious result. The stake fence, according to the surveyor's map relied on by the parties throughout this litigation, and as roughly reflected in the *Stiles I* diagram, 258 Or App at 148, does not run directly along the eastern boundary of the deeded easement strip, but rather deviates slightly further into defendant Stoner's lot. If our opinion in *Stiles I* had awarded plaintiffs the written description of the deeded easement, we would have been, in effect, holding that Stoner owned a sliver of land on plaintiffs' side of the fence.

When discussing the facts of *Stiles I*—as applied to the elements of statutory adverse possession—we stated:

"Plaintiffs' driveway cuts across the deeded easement at the southern end of the easement. *The driveway has been in place since plaintiffs' house was constructed.* The driveway is gated. A 1979 Josephine County Tax Assessor's diagram of the property includes * * * [the] driveway, and *there is no evidence in the record that plaintiffs' possession of * * * [the] driveway has been interrupted since then.* A cross fence connects the driveway gate with the wooden stake fence and blocks access to the deeded easement area. The driveway gate displays a sign that reads, 'POSTED, KEEP OUT, NO TRESPASSING.' The cross fence has been in place since at least 1979. It is unclear when the sign was placed on the gate."

*Id.* at 128-29 (emphasis added).

We then proceeded to apply several of those facts to the statutory requirements of an adverse possession claim. First, as has been noted, a critical factual foundation for our holding in *Stiles I* was Roger Stiles's belief that his property ran from "fence to fence." We concluded that his "belief had an objective basis under ORS 105.620(1)(b)(B) because it was consistent with the fencing of the easement *and the encroachment*[ ] of the * * * *driveway*." *Id.* at 130 (emphasis added). The reasonableness of Stiles's belief of ownership was further established because "[n]o objections were made by defendant or his predecessors to those residential uses or to the improvements made by plaintiffs." *Id.* Next, we stated that "[a]ll of the physical improvements to the deeded easement area are obvious, observable, and permanent. They are of the type that an owner would make and were sufficient to put the true owner of the property on notice of a claim of right to the property." *Id.* at 129. Last, the fact that the driveway had been in place since plaintiffs' house was constructed was significant as evidence that plaintiff had continuously possessed the land for the statutory vesting period.

The facts of the driveway's existence, age, placement, and use were all significant to our analysis, reasoning, and ultimate decision in *Stiles I*. In light of the above reasoning, the trial court's conclusion that "the factual basis for [*Stiles I*] did not apply to" the driveway and southern triangle portions

of the deeded easement was contrary to our decision in *Stiles I*, and, therefore, in error.[5]

Finally, plaintiffs challenge a provision in the trial court's amended judgment regarding defendant Stoner's carport. That provision reads, "Concerning the carport, originally located on the property of Defendant Stoner, Defendant Stoner's rights are preserved to reconstruct the carport in substantially the same location and configuration as it existed at the time of the commencement of the trial in July, 2005." The court apparently included that provision to address Stoner's concern that his carport would be in violation of local zoning setback requirements after his western property line was shifted towards his carport upon entry of the judgment.[6]

Plaintiffs contend that, because we considered and rejected the carport issue in *Stiles I*, we implicitly rejected defendant's right to reconstruct the carport. In the alternative, plaintiffs contend that neither they nor local government authorities were given a fair opportunity to be heard on the issue of the carport on remand. Defendants argue that the trial court properly exercised its equitable powers to address an ancillary issue in order to bring closure to the litigation.

---

[5] Although *Stiles I* did not mention the triangular portion of the deeded easement south of the driveway, it is implausible to suggest that our opinion in *Stiles I* intended to treat that portion any differently than the driveway; there is simply no factual basis to support a contrary conclusion.

[6] Specifically, the trial court stated:

"The carport was taken into consideration by this Court at the—at the Trial Court level. * * * [T]he carport was an issue but this Court dealt with it because of the way I ruled on the—the area directly adjacent to the carport. Obviously this Court's decision was appealed and then the Court of Appeals reversed that finding; but in any event, this Court did know about the carport, did take it into consideration in the decision that I made so because of that, out of fairness, it is—would not be fair now because of the Court of Appeals decision to somehow place the Defendants in the position of being out of compliance because of their carport so I am going to require that the Judgment address the carport * * *.

"I do not see how—how this could negatively [a]ffect the Plaintiffs because, as it was pointed out, they have been living with that configuration for a number of years and simply that the Court of Appeals has decided that there is ownership to that portion of—of land that should not effect the Plaintiffs' use or enjoyment if the Defendants have their carport. So for equitable purposes I see that that is the appropriate thing to do for the carport. The Defendant should have the ability to have their carport as it—as it was constructed for many years."

As an initial point, any issues with the carport were never before this court in *Stiles I*. The carport was never so much as mentioned in the parties' briefs in *Stiles I*, the carport was not raised at oral argument, and the resolution of *Stiles I* in no way turned on the existence of the carport. In short, *Stiles I* said nothing about the carport or any rights and obligations associated with it. The trial court addressed the issue on remand after a dispute between the parties ensued from Stoner's request that the court address the issue.

We agree with defendant that it was within the scope of the trial court's authority to address the issue, because nothing in our *Stiles I* holding or instructions limited the trial court from considering the carport on remand.[7] *Cf. State v. Boots*, 315 Or 572, 577, 848 P2d 76, *cert den*, 510 US 1013 (1993) (because the Supreme Court's remand instructions had "neither expressly *required* the trial court to retry defendant on every element of an aggravated murder charge, nor expressly *limited* the trial court to a trial on the existence of an aggravating factor," the trial court did not err by limiting the issues for consideration on remand (emphasis in original)). Thus, this is not a situation where the "trial court's actions on remand were contrary to our holding and directions" in *Stiles I*. *Custer*, 146 Or App at 489. The ancillary issue of Stoner's legal right to reconstruct his carport arose only as a consequence of our instructions to quiet title to a portion of Stoner's property in *Stiles I*; it was therefore appropriate for the trial court to address that issue after it fell into dispute following our remand.[8]

---

[7] Plaintiffs were not unfairly prejudiced by the trial court's decision to address the carport issue. Following our remand, plaintiffs initially agreed, in principle, to a judgment provision allowing Stoner to reconstruct his carport. After plaintiffs subsequently reversed their position, plaintiffs' counsel was given the opportunity to present argument on the issue. The trial court's decision to address the carport cannot be said to have caught plaintiffs by surprise.

[8] We understand, from the parties' arguments, that the carport provision represents an effort by the trial court to forefend any enforcement action against Stoner for noncompliance brought by the local zoning authorities. We feel compelled to note that, to the extent the carport provision does represent such an effort, the provision is without effect. The local zoning authorities were not a party to this litigation. *See* ORS 18.082 (a judgment "governs the rights and obligations of the parties that are subject to the judgment"); *Couch v. Couch*, 170 Or App 98, 103, 11 P3d 255 (2000), *rev den*, 332 Or 56 (2001) ("A judgment is of no legal effect with respect to a person who is neither a party to it nor is otherwise bound by it

Reversed and remanded for entry of judgment quieting title to that portion of the deeded easement over which plaintiffs' driveway runs and that portion of the deeded easement south of the driveway; otherwise affirmed.

---

under the rules of judgment preclusion."). Whatever effect the amended judgment may have on one party's rights and obligations *vis-à-vis* the other's rights and obligations is not clear to us; in any event, plaintiffs merely challenge the court's authority to enter the carport provision. Neither party assigns error to the substance of that provision.